UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

SHANNON TUTTLE,                          )
                                         )
         Plaintiff,                      )        Civil Action No. 5:17-CV-240-CHB
                                         )
v.                                       )
                                         )        **MEMORANDUM OPINION AND**
BAPTIST HEALTH MEDICAL GROUP,            )        **ORDER GRANTING MOTION FOR**
INC. d/b/a BAPTIST HEALTH                )        **SUMMARY JUDGMENT**
PULMONARY & CRITICAL CARE,               )
                                         )
         Defendant.                      )

***   ***   ***   ***

This matter is before the Court on the Defendant's Motion for Summary Judgment [R. 23] and the Plaintiff's Motion in Limine [R. 28]. On May 31, 2017, Plaintiff Shannon Tuttle filed this lawsuit, bringing claims for violation of the Americans with Disability Act (ADA), violation of the Kentucky Civil Rights Act (KCRA), and common-law wrongful termination. [R. 1] The Defendant moved for summary judgment nearly a year later, [R. 23], and a hearing was held on that motion and the Motion in Limine [R. 28] on August 13, 2018. [*See* R. 43] For the reasons discussed below, the Plaintiff has not demonstrated a genuine issue as to a material fact, and her claims must fail. Accordingly, the Court will grant the Defendant's Motion for Summary Judgment as to all claims.

## I.   BACKGROUND

The Plaintiff worked as a medical assistant for the Defendant's predecessor from 2005 to July 2010, and then for the Defendant from July 2010 until her termination on November 16, 2016. [R. 24-1, Deposition of Shannon Tuttle ("Tuttle Depo.") at pp. 68-70, 88-89, Page ID#: 288, 293; R. 24-2, Employee Separation Form at p. 1] The Plaintiff asserts that "[d]uring over

- 1 -

ten years of employment at the same office, [her] performance was praised by physicians and the practice manager for whom she worked." [R. 24, Plaintiff's Response to Motion for Summary Judgment ("Plaintiff's Response") at p. 3 (citing R. 24-4, Deposition of John Harrison ("Harrison Depo.") at p. 21 and R. 24-5, Affidavit of Donna Dunn ("Dunn Aff."))]  However, the deposition and affidavit which she cites contain statements from the manager and from one physician made *after* the onset of litigation, not statements (or references to statements) made during the Plaintiff's employment with the Defendant. *See id.*

In October 2015, the Plaintiff learned that her son, Dylan Cartwright, had been diagnosed as HIV-positive. [R. 24-1, Tuttle Depo. at pp. 94-95, Page ID#: 295]  The Plaintiff testified that she told Donna Dunn, the Practice Manager in Plaintiff's office, about her son's HIV-positive diagnosis (though it is unclear when); that she knew when she told Dunn that Dunn would keep this information confidential; and that she has no reason to think that Dunn did not do so. [R. 24-1, Tuttle Depo. at pp. 96-97, Page ID#: 295]  The Plaintiff did not name any other of her coworkers when asked if she told anyone about her son's diagnosis, although Dr. John Harrison (a doctor who worked in the same office as the Plaintiff) also apparently knew. *See id.*; R. 24-4, Harrison Depo. at pp. 31-32.

On December 22, 2015, the Plaintiff used the Defendant's computer system to access her son's medical records without authorization. [R. 24-1, Tuttle Depo. at pp. 117-118, Page ID#: 300, 301; R. 23-2, Portions of Plaintiff's Deposition and Deposition Exhibits at pp. 26-27, Page ID#: 133-134]  The Plaintiff admitted that she knew this was wrong [R. 24-1, Tuttle Depo. at p. 118, Page ID#: 301].  Based on this incident, the Defendant issued the Plaintiff a final warning in January 2016. [R. 23-2, Portions of Plaintiff's Deposition and Deposition Exhibits at *id.*]

On or about August 22, 2016, several area news organizations ran stories stating that Cartwright was HIV-positive and was facing charges after intentionally biting a corrections officer knowing that he was HIV-positive. [*See* R. 24-3, News Stories]  The Plaintiff claims that she "soon learned that many of her coworkers were discussing" these news stories. [R. 24, Plaintiff's Response at p. 3]  She testified that one of her coworkers, Michelle Clemons,[1] approached the plaintiff and expressed sympathy over the situation. [R. 24-1, Tuttle Depo. at p. 131, Page ID#: 304]  The Defendant argues that "[w]hile [the Plaintiff] believes all of her co-workers had seen news coverage of the incident involving her son, the only person she could specifically identify was Michelle Clemons." [R. 23-1, Memorandum in Support of Defendant's Motion for Summary Judgment ("Summary Judgment Memo") at p. 3]  But the Plaintiff also testified that Clemons (and perhaps a second coworker – the record is not clear on this point) told Plaintiff that Nancy VanDyke (yet another coworker) had shown one of the news videos in a "huddle" with "four or five of them."[2] [R. 24-1, Tuttle Depo. at p. 132, Page ID#: 304]  Another coworker, Brandy Martin, testified that she discussed one of the news stories with "Florence."[3] [R. 24-6, Deposition of Brandy Martin ("Martin Depo.") at pp. 75-76, Page ID#: 467-68]  The Plaintiff testified that she discussed "the story" with Dunn. [R. 24-1, Tuttle Depo. at p. 125, Page ID#: 302]  The Plaintiff testified that she did not discuss the incident with any coworkers other than Clemons and Dunn. [R. 24-1, Tuttle Depo. at p. 125, Page ID#: 302]

Though she testified to having a "good relationship overall" with her coworkers before the story, the Plaintiff claims that after the news stories were published, she was "alienated" from

---

[1] Spelled "Clemmons" in the Plaintiff's deposition transcript.

[2] As neither party has objected to the use of any deposition testimony on the basis that it is inadmissible pursuant to Fed. Rule Evid. 802 (The Rule Against Hearsay), the Court treats any such objection as waived.

[3] This appears to be a reference to another co-worker, Florence Bates. [*See* R. 24-6, Martin Depo. at pp. 32-33, Page ID#: 424-25]

her coworkers and "treated poorly and unprofessionally, hindering her ability to perform her job duties." [4] [R. 24-1, Tuttle Depo. at p. 124, Page ID#: 302; R. 24, Plaintiff's Response at p. 3 (citing[5] R. 24-1, Tuttle Depo. at p. 126, Page ID#: 303)]  The Plaintiff claims that she was "ostracized by co-workers with whom she previously had a professional and collaborative relationship, including . . . Stephanie Salyers . . . Melissa Haggard . . . Toni Milam . . . Nancy VanDyke . . . Florence Bates . . . Regina Leach[6] . . . and . . . Brandy Martin." [R. 24, Plaintiff's Response at p. 4 (citing Tuttle Depo. at pp. 126-134, Page ID#: 303-305)]  Citing her own testimony as well as Dunn's affidavit, the Plaintiff claims that "[t]he front desk staff . . . including Haggard, Salyers, and Milam, refused to provide Tuttle with notice of appointment arrivals." [*Id.* (citing R. 24-1, Tuttle Depo. at pp. 126, 130-32, Page ID#: 303, 304; R. 24-5, Dunn Aff.)]  However, Dunn's affidavit merely states that Tuttle told Dunn that this was the case.  [R. 24-5, Dunn Aff. at pp. 3-4]  After the Plaintiff complained to Dunn about this issue, Dunn "discussed the office protocol for notifying clinical staff members that patients had arrived with reception staff, including" Haggard, Salyers, and Milam. [R. 24-5, Dunn Aff. at pp. 3-4; R. 24-1, Tuttle Depo. at pp. 135-136, Page ID#: 305]

---

[4] Exactly how soon after the news stories this happened is unclear.  The Defendant did not directly say in her deposition.  Her brief claims that this happened "immediately," although the Complaint alleges that she took three days off after the news stories aired. [*Compare* R. 24, Plaintiff's Response at pp. 16-17 *with* R. 1, Complaint at p. 4]

[5] The Plaintiff and Defendant filed different versions of the Plaintiff's deposition, with the Plaintiff's version including the entire deposition transcript but none of the exhibits, and the Defendant's version including excerpts from the deposition transcript and at least two exhibits.  Naturally, each party cited to its own version of this deposition.  The same is true of various other depositions.  For the sake of simplicity, the Court will reference the full versions docketed as attachments to the Plaintiff's Response, regardless of which versions the parties actually cited, except when referring to materials that are only included in the Defendant's versions.

[6] The Plaintiff's brief seems to identify the persons referred to in deposition testimony as "Florence" and "Gina" to be Florence Bates and Regina Leach. [*See* R. 24, Plaintiff's Response at pp. 4, 6]  Because the Defendant does not raise a dispute as to the identity of these individuals, the Court will take these to be their identities for purposes of this Opinion.

The Plaintiff also claims that many staff members, including Haggard, Milam, Salyers, Bates, VanDyke, Leach, and Martin, "refused to speak with Plaintiff, or to remain in the same room of Defendant's premises with her." [R. 24, Plaintiff's Response at p. 4 (citing R. 24-1, Tuttle Depo. at pp. 126, 130, Page ID#: 303, 304] Finally, the Plaintiff testified that another coworker, Ranada Boone, told the Plaintiff that Martin "expressed a refusal to eat any dish prepared by the Plaintiff for an upcoming office potluck." [R. 24, Plaintiff's Response at p. 4; R. 24-1, Tuttle Depo. at pp. 99-100, Page ID#: 296] Based on this comment, the Plaintiff testified that she thought Martin believed HIV to be communicable in ways other than the exchange of bodily fluids. *Id.* The Plaintiff testified that she is not aware of any other comments from coworkers regarding HIV. *Id.* at p. 101.

On October 26, 2016, one of the Defendant's employees, Angela Allen, made an anonymous call to Shannon Robinson, the Defendant's Operations Manager. [R. 24-7, Deposition of Shannon Robinson ("Robinson Depo.") at pp. 5, 15-16, 27] Allen complained about bullying/being "picked on," favoritism, and changed job duties, specifically mentioning Dunn by name. [R. 24-7, Robinson Depo. at pp. 16-19; R. 24-8, Deposition of Amy Morrison ("Morrison Depo.") at p. 23] She did not mention anyone else or refer to the Plaintiff. [R. 24-7, Robinson Depo at pp. 17-19]

Allen's complaint kicked off an investigation. Robinson testified that she "hardly ever" conducted human resources investigations. [R. 24-7, Robinson Depo. at pp. 10] She testified that she could recall one other human resources investigation that she "kind of sat in on." *Id.* at p. 11. She testified that this other investigation "wasn't anything to [the] magnitude" of the investigation into Allen's complaint, that she "shouldn't even call it an investigation," and that it was just a "meeting" or "more me going and talking to each employee and just listening." *Id.* at

pp. 12-13. After receiving Allen's complaint, Robinson conferred with Amy Morrison, her supervisor and the Defendant's Director of Operations. [R. 24-7, Robinson Depo. at pp. 19-20; R. 24-8, Morrison Depo. at pp. 5, 9-10] Morrison suggested that Robinson speak with Lisa Stidham, who worked in Human Resources.[7] [R. 24-7, Robinson Depo. at p. 20] Robinson did so the next day, asking Stidham what she thought Robinson should do. [R. 24-7, Robinson Depo. at p. 20] Stidham advised talking to each employee, and at Robinson's request, emailed her a list of sample questions. *Id.* at p. 21. The sample included the following list of information that should be gathered:

> Statement of complaining employee should include the following (1) date and time of incident, (2) the location of incident, (3) the company employees involved, (4) any witnesses to the incident, (5) precise nature of the complaint, (6) any additional facts relevant to the complaint.

[R. 24-9, Investigation Questionnaire at p. 2, Page ID#: 698] Stidham's sample list also included the following questions:

> "(1.) Do you feel this is an uncomfortable working environment?"; (2.) Have you been subject to any type of aggressive or inappropriate behavior(s)? Please provide specific details of incident(s)."; "(3.) Were there witnesses to the incident(s)?"; "(4.) Did you report the incident to anyone?"; "(5.) Have you been a witness in seeing other coworkers being mistreated by another coworker?"; "(6.) Did you report the incident to anyone?"; "(7.) Were there other witnesses to the incident(s)?"; and "(8.) Do you have any other concerns that you would like to bring to our attention?"

[R. 24-9, Investigation Questionnaire at pp. 2-4, Page ID#: 698-700] The sample list also included a space for additional comments from the employee. *Id.* at p. 5, Page ID#: 701.

Robinson testified that she then edited the list of questions; while she did not think her questions matched the ones which Stidham had sent "one hundred percent," she may or may not have added some questions. [R. 24-7, Robinson Depo. at p. 21] She also testified that the list of

---

[7] Stidham's exact position is not clear from the record.

- 6 -

questions she used didn't have the "introductory paragraph" about the statement of the employee. *Id.* at. p. 35. Neither party attached the actual questions used in the investigation to the briefing on the Motion for Summary Judgment. However, based off of Robinson's testimony and the documents filed in the record at R. 29-1 (copies of notes from employee interviews, attached as an exhibit to the Defendant's Response to the Plaintiff's Motion in Limine), it appears that she did not include the six-part list of information to be gathered in employee statements, but kept the eight-part list of questions with a few minor wording revisions, and then added two questions: "Do you feel all staff are treated fairly?" and "As far as communication, do you feel well-informed regarding office policies, system initiatives, and goals for the practice?" [*See* R. 29-1, Interview Notes at pp. 2-8, Page ID#: 753-759]

Over the course of two or three days (November 3, 8, and possibly 10[8], 2016) Robinson and Stidham (who attended per Dunn's request) conducted employee interviews. [R. 24-7, Robinson Depo. at p. 31; R. 24-5, Dunn Aff. at p. 3] The Plaintiff claimed in her response brief that "the interviews consisted of Robinson asking employees only the modified questions (i.e. whether they felt comfortable; were subject to aggressive behavior)." [R. 24, Plaintiff's Response at p. 6] The record shows the opposite. The same exhibit which the Plaintiff uses to establish the six-part list of information which Robinson did **not** use clearly shows that the questions on whether the working environment was comfortable, and whether employees had been subject to aggressive or inappropriate behavior (and a request for specific details) *were* included in the original sample list which Stidham sent to Robinson. [R. 24-9, Investigation Questionnaire at p. 1, Page ID#: 698]

---

[8] The parties' briefs do not agree, and Robinson's deposition testimony does not unambiguously establish, whether interviews were also conducted on the 10th. [*See* R. 23-1, Summary Judgment Memo at p. 5; R. 24, Plaintiff's Response at p. 6; R. 24-7, Robinson Depo. at p. 32]

Robinson testified that she only expected to hear complaints about Practice Manager Dunn. [R. 24-7, Robinson Depo. at p. 23]  The interviewed employees did indeed complain about Dunn.  Robinson – who testified that there were issues with Dunn "not sharing information" – heard from some of the employees that the Plaintiff and Dunn were "good friends," "almost like family," associated outside of work, said "I love you" to one another frequently,  and "just had a very close relationship." [R. 24-7, Robinson Depo. at pp. 46-47]  Robinson testified that Dunn was not forthcoming with problems at the office; that through the course of the interviews she (Robinson) concluded that the Plaintiff and Dunn were "buddies" and that Dunn would not report anything negative about the Plaintiff; and that Dunn was too close to the Plaintiff  [R. 24-7, Robinson Depo. at pp. 43-44, 46, 50].

Martin testified that prior to her interview with Robinson, she had expressed to Allen that Dunn "wasn't fair and showed favoritism." [R. 24-6, Martin Depo. at p. 35]  Martin explained that Dunn showed favoritism towards the Plaintiff, that the Plaintiff knew things before anyone else in the office, and that Dunn and the Plaintiff were friends. [R. 24-6, Martin Depo. at p. 35-36]  Martin testified that Dunn "treated [the Plaintiff] differently from everyone else" and that Martin did not report an incident where the Plaintiff called her a name and made her feel threatened "because [Dunn and Plaintiff] are friends," and because Dunn would overlook the complaint due to her friendship with the Plaintiff, as others had told Martin in the past that they had reported things about Plaintiff and nothing was done. [R. 24-6, Martin Depo. at pp. 35, 48]  Martin testified that another employee ("Ella") saw the Plaintiff key someone's car and complained, but that nothing was ever done about that complaint. [R. 24-6, Martin Depo. at p. 44]  Robinson testified that her understanding was that this allegation was not investigated at all. [R. 24-7, Robinson Depo. at p. 80]  Dunn's affidavit stated that while Ella Coyle had complained

to Dunn about the alleged keying, Coyle did not file a written complaint or provide Dunn with sufficient information to investigate. [R. 24-5, Dunn Aff. at p. 2]

The employees also complained about the Plaintiff. According to Robinson's testimony, the employees who complained about the Plaintiff included Salyers, Haggard, Milam, VanDyke, Bates, Leach, one "Ella,"[9] and Martin. [R. 24-7, Robinson Depo. at pp. 42 ,43, 54, 58, 60, 69, 77, 84] The Plaintiff asserts that several of the employees discussed the investigation and the interviews both before and during the investigation. [R. 24, Plaintiff's Response at p. 7 (citing R. 24-6, Martin Depo. at pp. 33, 55)] However, the Plaintiff cites only Martin's testimony showing that Martin discussed the possibility of there being an investigation (based upon Allen's anonymous complaint, *id.* at p. 32) with Ella, Bates, "probably Karen," Allen, and "probably a lot of people," though she was "not sure exactly who," *id.* at p. 33, and that after being interviewed, Martin discussed her interview with Bates, Ella, Karen, and "Freddy." *Id.* at p. 55. Even though, as discussed below, as many as ten to twelve employees complained, the Plaintiff cited to no evidence regarding what any of the other employees (such as Salyers, Haggard, Milam, VanDyke, or Leach) discussed. Nor did she cite to any evidence whatsoever that any of the employees discussed the interviews *before* they occurred. Moreover, in a portion of her deposition which the Plaintiff did not cite, Martin stated that she did *not* speak with any of the other employees about her interview before her interview occurred, and would not have had any conversations with any of the employees about what to expect in the interview. *Id.* at p. 38.

The complaints, which the Plaintiff characterizes as "an airing of bizarre and frivolous gossip" about her, included allegations which were anything but frivolous. [*Contra* R. 24, Plaintiff's Response at p. 6.] The complaints included that the plaintiff was "the office bully,"

---

[9] Possibly Ella Coyle, but the record is not clear.

[R. 24-7, Robinson Depo. at p. 43; *see also* R. 24-8, Morrison Depo. at p. 59], and engaged in a plethora of inappropriate behavior including asking another employee "do you ever smile?"; calling a pregnant co-worker "huge"; "mooing" like a cow; "flashing and mooning" co-workers; "flipping off" co-workers; "snarling"; "grunting"; asking a co-worker whether she had washed her hands; and rolling her eyes and saying "uhh" while walking by a co-worker. [R. 24, Plaintiff's Response at p. 6]  The Plaintiff did not dispute the Defendant's description of the testimony as including complaints that the Plaintiff called a co-worker a "bitch," [R. 23-1, Summary Judgment Memo at p. 6; R. 24-6, Martin Depo. at p. 42]; started a rumor that Martin and Freddy were having an affair and that the child would look like Freddy when it was born, [R. 23-1, Summary Judgment Memo at p. 6; Martin Depo. at p. 68]; and called a co-worker a "freak," [R. 23-1, Summary Judgment Memo at p. 6; Martin Depo. at p. 70].[10]  Multiple employees reported feeling "physically threatened or intimidated" by the Plaintiff. [R. 24, Plaintiff's Response at p. 6; R. 24-8, Morrison Depo. at pp. 28-29, 44-46]  Dunn's affidavit stated that aside from the keying incident, no other complaints of harassment had been leveled against the Plaintiff before this investigation. [R. 24-5, Dunn Aff. at p. 2]

Robinson reported the results of the interviews to Director of Operations Morrison, who was "shocked" to hear the allegations and responded that it was a serious matter and that they needed to take it seriously. [R. 24-8, Morrison Depo. at p. 38]  On November 9, 2016, the day after the second round of interviews took place, Stidham from human resources and Robinson both recommended termination. [R. 24-8, Morrison Depo. at p. 45]  Stidham emailed Robinson discussing grounds for the Plaintiff's termination: "[p]rofanity . . . [t]hreatening, harassing,

---

[10] The Defendant alleges that there were complaints that the Plaintiff engaged "in 'fake humping' behavior," but the portions of the record to which the Defendant cites refer to another employee engaging in this behavior, not the Plaintiff. [*Contra* R. 23-1, Summary Judgment Memo at p. 6; R. 24-7, Robinson Depo. at p. 82]

intimidating fellow [co-workers] . . . and [p]hysical conduct of a sexual nature . . . [including] mooning/flashing." [R. 24-8, Morrison Depo. at pp. 44-45; R. 24-10, Email from Stidham to Robinson] After this point, Morrison became actively involved. *Id.* at pp. 39-40.

On the next day, November 10, 2016, Morrison, Robinson, and Stidham met with employees and took voluntary written statements from employees whom Robinson and Stidham had already interviewed. [R. 24-8, Morrison Depo. at pp. 39, 41, 43-44] Morrison testified that she did not recall asking any employees follow-up questions about their statements. [R. 24-8, Morrison Depo. at p. 52] Morrison acknowledged that the allegations were "bizarre," but testified that the termination decision was based on the general sentiment in the employee statements that the Plaintiff was a "bully"[11] "[o]r intimidating other employees" and that because the majority of the staff shared this sentiment, dates and times of alleged incidents were not that important. [R. 24-8, Morrison Depo. at pp. 56, 58-59] Morrison also testified that "ten to twelve employees" or "60 percent of office personnel . . . had made some sort of statement" about the Plaintiff, but that the witness statements were "a factor in the decision" but "not the entire reason." [R. 24-8, Morrison Depo. at p. 37]

That same day, Robinson and Stidham[12] met with the Plaintiff and told her about the complaints, including "flashing and mooning and bullying," as well as the "mooing," all of which the Plaintiff denied. [R. 24-7, Robinson Depo. at p. 91] Per the recommendation of Human Resources, the Plaintiff was suspended that same day rather than terminated

---

[11] The Plaintiff's characterization, that "[a]ccording to Morrison, Tuttle was terminated due to a staff that 'share[d] the sentiment' that Tuttle was physically threatening," is misleading to the extent that it implies that Morrison's testimony implied that the physical threat was that of HIV/AIDS transmission or exposure. [*Contra* R. 24, Plaintiff's Response at p. 7]

[12] The parties apparently agree that both Robinson and Stidham were in this meeting; the Plaintiff's response brief also asserts that Morrison was there, but the cited portions of the record do not clearly show this to be the case. [*See* R. 24, Plaintiff's Response at p. 7 (citing R. 24-8, Morrison Depo. at p. 39)]

immediately; she was then terminated on November 16, 2016. [*Id.*; R. 24-8, Morrison Depo. at p. 61]  The termination notice stated that

> [s]everal instances of misconduct on [the Plaintiff's] part have been recently discovered.  There have been instances of profanity (flipping coworkers off), as well as physical conduct of a sexual nature (mooning/flashing).  These behaviors are inappropriate in the workplace and completely unacceptable.  Furthermore, they violate Baptist's Sexual and Workplace Harassment Policy.  [The Plaintiff] was issued a final warning on 1/14/16 [for violation of the Defendant's policy protecting HIPAA-protected information from unauthorized access], which stated that any additional issues in performance would result in termination.  At this time, [the Plaintiff] will be terminated due to her behavior and misconduct.

[R. 24-2, Employee Counseling and Corrective Action Form at p. 1]    Morrison testified that no one in the course of the investigation ever indicated to her that the Plaintiff had a son who had been diagnosed with HIV, and that she was not aware of this information at the time. [R. 24-8, Morrison Depo. at p. 62]  Plaintiff does not allege that any of the complaining employees brought up Cartwright's HIV-positive status at any time.  There appears to be no dispute that the actual decisionmakers (whom the Defendant claims were Morrison, Robinson, and Stidham) did not know about Cartwright's HIV-positive status at any time before Plaintiff's suspension or termination. [*Compare* R. 23-1, Summary Judgment Memo. at p. 12 (asserting that Robinson, Stidham, and Morrison were the actual decisionmakers and did not know about Cartwright's HIV) *with* R. 24, Plaintiff's Response at p. 16 (arguing that whether the decisionmakers were aware is not determinative due to the cat's paw theory)]

## II.    DISCUSSION

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Lindsay v.*

*Yates,* 578 F.3d 407, 414 (6th Cir. 2009). The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986). When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### A. Americans with Disabilities Act Claim

The Plaintiff's first claim is an associational discrimination claim under the ADA. The ADA prohibits, among other things, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C.A. § 12112(b)(4).

Because the Plaintiff does not offer direct evidence of discrimination, the Court must analyze this claim through "a *McDonnell Douglas*-like burden-shifting test." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). Under this framework, a plaintiff must first make out a *prima facie* case of impermissible discrimination by showing "(1) the employee was qualified for the position; (2) the employee was subject to an adverse employment action; (3) the employee was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision." *Id.* The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 382, 384 (6th Cir. 2017) (stating rule in the context of FMLA retaliation claim, then applying it to FLMA and ADA retaliation and claims). This burden is one of production, not persuasion. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (Title VII context). Once the employer has done so, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *Id.* at 347.

Where an employee does not allege discriminatory bias on the part of those who made the ultimate decision to take an adverse employment action, but instead on the part of their subordinates (known as the "cat's paw" theory), the analysis takes on an additional, separate step. *See Rawlings*, 854 F.3d at 379–80, 384 (describing cat's paw liability in the context of FMLA retaliation claim, then applying the same analysis to ADA retaliation claim) (citing *Chattman*, 686 F.3d at 347 and *DeNoma v. Hamilton Cty. Court of Common Pleas*, 626 F. App'x 101, 105 (6th Cir. 2015)). "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal

decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. . . . A plaintiff alleging liability under the cat's paw theory seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Rawlings*, 854 F.3d at 377 (quotation marks omitted) (citing *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) and *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). The Court will first examine cat's paw liability in this case, and then turn to the burden-shifting framework.

### a) Cat's Paw Liability

The record is clear that none of the decision-makers knew about Cartwright's HIV-positive status. The Plaintiff points to no evidence to dispute this. Consequently, the only way the Plaintiff's claims can survive is under the cat's paw theory. However, the Court does not believe that the cat's paw theory should apply to this case. The Plaintiff failed to cite, and the Court is unable to find, a single Sixth Circuit case applying the cat's paw theory to the actions of co-workers with no more influence over decision-makers than the mere ability to report others' misconduct. The Plaintiff falsely claimed that "the Sixth Circuit presumes that cat's paw liability can arise from the discriminatory actions of co-workers in addition to supervisors." [R. 24, Plaintiff's Response at p. 13 (quoting *Seoane-Vazquez v. Ohio State Univ.*, 577 Fed. App'x 418, 428 n.4 (6th Cir. 2014)).] That is not the law. In reality, *Seoane-Vazquez*, examining a tenure decision, noted in a footnote that "[i]n the context of tenure decisions, *the line between coworker and supervisor is significantly blurred*, and even a few colleagues can wield dispositive influence over a plaintiff's academic future," then "*assume[d]*" that cat's paw liability could apply in that context, but found the claim failed anyway. *Seoane-Vazquez*, 577 Fed. App'x at 428 n.4 (emphasis added) (internal quotation marks and citations omitted). The court did *not*

describe the plaintiff's colleagues as being purely co-workers, much less state a general presumption that cat's paw applies to mere co-workers.

In *Voltz v. Erie Cty.*, 617 Fed. App'x 417 (6th Cir. 2015), the Sixth Circuit explained in the Title VII context that "the most probative factor of the cat's paw analysis when determining whether an employee is one whose animus may be imputed to an employer is the 'employee's ability to influence the ultimate decisionmaker.'" *Voltz v. Erie Cty.*, 617 F. App'x 417, 424 (6th Cir. 2015) (citing *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 353 (6th Cir. 2012)). The court went on to examine the Supreme Court's opinion in *Vance v. Ball State Univ.*, 570 U.S. 421 (2013):

> Our extension of cat's paw liability is reinforced by the Supreme Court's decision in *Vance v. Ball State University*, —— U.S. ——, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013). *Vance* is a Title VII harassment case in which the court held that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim. The ability to take "tangible employment actions" means that the individual can "effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Voltz*, 617 Fed. App'x at 424 (internal quotation marks and citations omitted).

*Chattman* and *Voltz* supply helpful examples of who qualifies for cat's paw liability. *Chattman*, decided a year before *Vance* and three years before *Voltz*, applied the cat's paw theory to a human resources director who misinformed upper management about an investigation process and had made comments including the N-word, "racist language and the threat or suggestion of violence or death based on race." *Chattman*, 686 F.3d at 344, 349, 353. In *Voltz*, the court found the *Chattman*/*Vance* standard was met where an employee "(1) interviewed and hired candidates . . . ; (2) determined salary increases; and (3) made recommendations regarding whether to terminate employees." *Id.* However, the *Voltz* court found no evidence of

discriminatory animus, even though the "supervising" employee in question had (among other things) told the Plaintiff that his "'command presence' was an issue in a building 'full of estrogen . . . [and] as a male, he was not going to survive.'" *Id.* at 425.

Here, there is no evidence whatsoever that the co-workers who complained about the Plaintiff had any of the supervisory, management or decision-making abilities outlined above. On this record, the sole source of their ability to influence the Defendant was their ability to complain. In the absence of binding authority stating otherwise, the Court does not believe that the cat's paw theory should be expanded to co-workers who have absolutely no ability to influence a decision-maker other than by reporting misconduct. If the mere ability to report misconduct counts as the ability to take a tangible employment action, then the distinction which the Supreme Court drew in *Vance*, between those who have such abilities and those who do not, is meaningless: all employees have the ability to report to their superiors that other employees are engaging in misconduct. Employers receiving complaints of misconduct would be stuck between a rock and a hard place – unable to immediately fire wrongdoers (and thereby help guard against potential liability for, say, a hostile work environment), but obligated to conduct elaborate investigations in order to also shield against liability for the motivations of mere co-workers making the complaints. Such a situation runs completely counter to the foundational employment discrimination law principle that employers are free to fire an employee for a good reason (or a bad reason, or no reason) – just not a *discriminatory* reason. What is more, that does not seem to comport with the policy undergirding the cat's paw theory, of guarding against situations in which "decisionmakers unthinkingly adopt the recommendations of their biased lower-level supervisors" or exercise "a strategic option . . . to evade liability . . . through willful blindness as to the source of reports and recommendations." *Rawlings*, 854 F.3d at 378 (internal

quotation marks and citations omitted).  There is no indication that either scenario was unfolding in this case.

Yet even if the Court were to hold the cat's paw theory applicable here, it would fail. The Sixth Circuit has indicated in the context of a retaliation claim under Title VII[13] that cat's paw liability attaches where "(1) non-decisionmakers took actions intended to [cause an adverse employment action], and (2) those . . . actions were a but-for cause of" the adverse employment action. *Seoane-Vazquez*, 577 Fed. App'x at 428.  While the Defendant does not dispute that the complaints against the Plaintiff played a role in her termination, the parties have not briefed the question of whether the complaints were the but-for cause of her termination, since they assumed that proximate cause was the applicable standard.  The Court strongly questions whether the but-for causation standard is met here, given the fact that the Plaintiff was on her final warning and that the final warning factored into the termination decision. *See Seoane-Vazquez*, 577 Fed. App'x at 428 (explaining that, due to the but-for causation standard, "a Title VII plaintiff alleging retaliation cannot establish liability if her firing was prompted by both legitimate and illegitimate factors").  Likewise, the Plaintiff points to no evidence – other than her own assertions that the allegations against her were false – that her coworkers' complaints were intended to cause her termination.  However, even assuming that both of these elements were met, the Plaintiff's cat's paw theory would still fail for a lack of discriminatory animus.

As the Plaintiff herself apparently recognizes, "[a]s a predicate to cat's paw, [plaintiffs are] required to establish that the record supports discriminatory animus." *Voltz*, 617 Fed. App'x at 424–25 (citing *Staub,* 562 U.S. at 422-23, discussing cat's paw liability under the Uniformed

---

[13] Such claims bear the same causation standard as ADA discrimination claims: but-for causation. S*ee Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (*called into doubt by statute as stated in Figueroa Guzman v. WHM Carib, LLC*, 169 F. Supp. 3d 304, 309 (D.P.R. 2016)) (expressing doubt that ADA causation standard remains "but-for" past 2008).

Services Employment and Reemployment Rights Act); [R. 24, Plaintiff's Response at pp. 18-19 (asserting that the Plaintiff's co-workers harbored discriminatory animus)]. After all, as discussed above, the reason for the existence of the cat's paw theory of liability is to impute the discriminatory animus of a subordinate to the decisionmaker; without such animus, the cat's paw analysis becomes a pointless exercise. While the Plaintiff does not discuss the standard for showing animus, the Sixth Circuit has stated in the context of other antidiscrimination statutes that this "evidence of animus is difficult to demonstrate," *Voltz*, 617 F. App'x at 424-425 (citing *Thompson v. UHHS Richmond Heights Hosp., Inc.,* 372 Fed. App'x. 620, 626 (6th Cir. 2010) (analyzing pretext for Title VII, state law, and section 1981 claims)), and that "[d]iscriminatory animus . . . requires a showing of prejudice, spite, or ill will." *Id.* at 425 (citations omitted).

Here, even drawing all reasonable inferences in favor of the Plaintiff, she has not demonstrated the existence of a genuine issue of material fact on this issue. To be sure, there is evidence to support a finding of animus. But the Plaintiff has not pointed to anything allowing a reasonable inference that this animus was *discriminatory* – that is, grounded in prejudice, spite, or ill will based on the Plaintiff's association with her HIV-positive son.

As evidence of the requisite discriminatory animus, the Plaintiff cites to "numerous examples of the statements, allegations, and unprofessional conduct on the part of her co-workers, including several of the individuals who later reported false allegations of misconduct to Defendant's decisionmakers" contained within the Plaintiff's deposition testimony, Robinson's deposition testimony, Dunn's affidavit, and an email from Martin to Robinson sent on November 11, 2016, detailing "[t]hings [the Plaintiff] has done to me personally" and "[t]hings I have witnessed [the Plaintiff] do to others." [R. 24, Plaintiff's Response at p. 19; R.

24-11, Martin Email to Robinson] These "statements, allegations, and unprofessional conduct"

contained in the portions of the record to which the Plaintiff cites include:

**From the Plaintiff's deposition testimony:**

- The Plaintiff was "alienated," her work was kept from her, and she was "left out [the] loop" for "patient flow." [R. 24-1, Tuttle Depo. at p. 126, Page ID#: 303]

- The Plaintiff's co-workers would walk out of the room when the Plaintiff walked in. *Id.*

- Nobody had any small talk for the Plaintiff anymore. *Id.*

- Nobody wanted to talk to the Plaintiff anymore. *Id.* at p. 130, Page ID#: 304.

- The Plaintiff was unable to carry out her job duties because her coworkers were "holding charts." *Id.* at pp. 130-131.

- Clemons told the Plaintiff that she was sorry (apparently about the news stories or the situation with Cartwright). *Id.* at p. 131.

- Another co-worker told the Plaintiff that Nancy VanDyke showed her one of the news stories, and Clemons told the Plaintiff that she had seen such a news story in a "huddle" totaling four or five people in which VanDyke showed the story. *Id.* at p 132.

- The Plaintiff's co-workers would stop talking when she came into a room. *Id.* at p. 133.

- The Plaintiff felt alienated. *Id.*

- Several people treated the Plaintiff differently after the news stories aired. *Id.* at pp. 133-34.

**From Dunn's affidavit:**

- After the news stories about Cartwright ran, the Plaintiff told Dunn that co-workers at the reception desk "were no longer notifying her that patients had arrived to receive Xolair injections from" the Plaintiff. [R. 24-5, Dunn Aff. at pp. 2-3]

- Dunn then "discussed the office protocol for notifying clinical staff members that patients had arrived with reception staff, including" Salyers, Haggard, and Milam. *Id.* at p. 3.

**From Robinson's deposition testimony:**

- Bates complained that the Plaintiff was "the office bully," that Bates was very uncomfortable, that the Plaintiff made comments and that the Plaintiff was intimidating. [R. 24-7, Robinson Depo. at p. 43]

- Bates stated that she witnessed the Plaintiff mistreat Leach, Martin, Haggard, and Salyers. *Id.* at p. 54.

- Martin stated that the Plaintiff used vulgar language, asked "do you ever smile," flipped her off (as witnessed by another co-worker), made "comments," and felt threatened by the Plaintiff's behavior. *Id.* at p. 58.

- Salyers stated that she had a fear of retaliation, was uncomfortable around the Plaintiff and did not want to be on the Plaintiff's bad side, was scared of the Plaintiff, that the Plaintiff had a close relationship with Dunn, that "no one want[ed] to rock that boat," and that the Plaintiff made gestures and rude comments. *Id.* at p. 60.

- Milam stated that she did not feel safe and that the Plaintiff, "Katie," Dunn, and Boone were "kind of like a little group." *Id.* at p. 69.

- Haggard stated that the Plaintiff was the "office bully," and made the following complaints about her: "confrontational, negativity, goes by nurse [though she was not a nurse], mooned, flipped off, rude faces, noises, blunder, retaliates." *Id.* at p. 77.

- VanDyke complained that petty things happened in her area (such as things getting "messed up" and pens being "knocked") and that the Plaintiff got preferential treatment and was very childish. *Id.* at p. 84.

**From Martin's email to Robinson:**

- Martin complained that the Plaintiff asked Martin "Do you ever smile?" "Why don't you ever smile?" and called Martin "stone cold" because she did not think Martin smiled enough. [R. 24-11, Martin email to Robinson]

- Martin complained that the Plaintiff asked Martin "When are you going to buy new scrubs?" *Id.*

- Martin complained that the Plaintiff told Martin "I really cannot stand you and you are such a bitch." *Id.*

- Martin complained that the Plaintiff flipped Martin off (as witnessed by two other co-workers, "Katie L." and "Freddy"). *Id.*

- Martin complained that the Plaintiff started a rumor about Martin and Freddy having an affair and described this rumor in vulgar terms, and stated that Martin's child would look like Freddy. Martin stated that Ranada was involved in this conversation. *Id.*

- Martin complained that the Plaintiff called Martin huge while Martin was pregnant. *Id.*

- Martin complained that the Plaintiff rolled her eyes and said "uhh" while walking by Martin. *Id.*

- Martin complained that she had witnessed the Plaintiff asking Milam if Milam ever smiled. *Id.*

- Martin complained that she had witnessed the Plaintiff asking VanDyke if she washed her hands. *Id.*

- Martin complained that she had witnessed the Plaintiff calling Leach a "freak." *Id.*

- Martin complained that she had witnessed the Plaintiff flipping off and mooning one "Gayle," "who retired early because she felt so threatened by" the Plaintiff. *Id.*

None of these "statements, allegations, [or] unprofessional conduct" would allow a reasonable jury to conclude that the Plaintiff's co-workers harbored discriminatory animus against the Plaintiff because her son was HIV-positive.

As to the "unprofessional conduct," just because some or all of the Plaintiff's co-workers were aware of the news stories revealing Cartwright's HIV-positive status does not transform the alleged "unprofessional behavior" in which the Plaintiff claims some of her co-workers engaged very soon after the stories aired – such as walking out of the room when the Plaintiff walked in, not talking to the Plaintiff, withholding charts, or failing to notify the Plaintiff of patient arrivals – into evidence of animus based on Cartwright's HIV-positive status. The Plaintiff did not cite to authority showing that temporal proximity can establish discriminatory animus. And it is unclear what kind of HIV-related fear or stigma might lead persons to stop talking to the Plaintiff, being in the same room as her, giving charts to her, or notifying her of patient arrivals. The Plaintiff offered no evidence allowing an inference that her co-workers thought that such activities might cause transmission of the HIV virus.[14] To the contrary, as healthcare workers, her co-workers were very likely to have known, as medical science has known for decades, that

---

[14] As discussed below, Martin's remark about not eating any dish brought by the Plaintiff does not even mention HIV or Cartwright and therefore does not support an inference related to HIV or Martin's beliefs regarding the methods by which HIV is transmitted.

"HIV is not airborne or spread by casual contact." *Wilmoth v. Hamblen Cty. Jail Staff*, No. 2:09-CV-121, 2009 WL 4807622, at *3 (E.D. Tenn. Dec. 9, 2009) ("After all, 'an inmate's HIV status alone does not make it likely that the inmate will transmit their (sic) HIV virus to another; [r]ather, it is an HIV[positive] inmate's behavior toward non-HIV inmates which carries the risk of HIV transmission.'") (citation omitted).  The Plaintiff has not offered evidence supporting any other theory explaining the link between this treatment and her son's HIV-positive status.

If anything, the Plaintiff's arguments prove too much: the Plaintiff herself describes the situation as being that news coverage revealed not only her son's HIV-positive status, but also "the suggestion that [Cartwright] had recklessly spread blood pathogens." [R. 24, Plaintiff's Response at p. 15]  If *that* is what caused the Plaintiff's co-workers' fear – that is, if they were afraid because the news stories implied that her son recklessly spread HIV by biting people and they feared she might do the same – then that would go to show that the co-workers' animus was not due to discrimination because of the Plaintiff's "association" with an HIV-positive person, but rather fear that the Plaintiff would commit a dangerous assault similar to the one her son was alleged to have already committed.

As to the other "statements and allegations" made by the Plaintiff's co-workers and referenced in these portions of the record, the Court construes the Plaintiff's argument to be that the allegations prove discriminatory animus because they were false.  The Court pauses here to note its skepticism that it is required to construe the evidence and all reasonable inferences therefrom as showing that the allegations against the Plaintiff were false.  The Plaintiff effectively asks this Court to infer that her co-workers saw the news stories revealing her son's HIV-positive status, all recognized that Cartwright was her son despite having a different last name, immediately started shunning her because her son had HIV but exercised enough restraint

to keep from making a single reference about her son or his condition, patiently (and silently) waited to take any action until the opportunity presented by an unrelated investigation into Dunn (being conducted by decisionmakers who were unaware of Cartwright's HIV-positive status), coordinated consistent complaints in little if any time (because they did not know what the interviews were about beforehand), and made consistent oral and then written complaints without contradicting one another or once making any reference at all to the Plaintiff's son or his condition − all based solely on the Plaintiff's denials of having engaged in the various bad behaviors. The Court finds this long and convoluted inferential chain unrealistic. *See Seoane-Vazquez*, 577 Fed. App'x at 430, 432 ("there are simply too many weak links in this causal chain . . . Conspiratorial theories based on little more than speculation cannot save a claim from summary judgment."). The Plaintiff's bare denials strike this Court as a "mere scintilla" of evidence which is insufficient to create a genuine issue of material fact as to the falsity of the allegations against her. But even if the Court were required to infer that the allegations were false, this would not create a genuine issue of *material* fact, because the Plaintiff has failed to bridge the inferential gap between the supposedly falsified allegations and the existence of discriminatory animus based on her association with Cartwright.

While the Plaintiff does not directly cite to it as proof of animus, the Court will also examine the evidence that she cites to show the fourth prong of her *prima facie* case (circumstances raising a reasonable inference that Cartwright's HIV-positive status was a determining factor in the decision to take the adverse employment actions). The Plaintiff lists six separate items: 1) the temporal proximity between the news stories disclosing Cartwright's HIV-positive status and the Plaintiff's termination (as well as between the news stories and "unprofessional and isolating treatment"); 2) Martin's remark that she would "refus[e] to eat any

dish prepared by the Plaintiff for an upcoming office potluck" along with statements by others that the Plaintiff "was 'physically threatening,'"; 3) the fact that the decisionmakers admitted they relied on the sentiments of the Plaintiff's co-workers; 4) that "the same co-workers alleging misconduct by [the Plaintiff] had seen the News Stories about Plaintiff's son, and since that time had demonstrated behavior indicative of bias against" her; 5) the fact that the co-workers' allegations had not been reported before the investigation; and 6) "decisionmakers ignored evidence contradicting the 'sentiments' on which they relied and did not conduct an independent investigation of the allegations on which they based [the Plaintiff's] termination." [R. 24, Plaintiff's Response at pp. 16-18] None of these things create a genuine issue of material fact, because they do not permit the inference that the Plaintiff's co-workers harbored *discriminatory* animus.

First, the Plaintiff's temporal proximity argument is unconvincing. As noted, she has not shown that temporal proximity can establish discriminatory animus. And even if evidence of temporal proximity sufficient to show the last prong of the *prima facie* case could also serve to establish discriminatory animus, there is no such evidence here.

Citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497 (6th Cir. 2014) and *Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008), the Plaintiff asserts that "the closer in time a protected action or condition is followed by an adverse action, the more likely temporal proximity will support an inference of discrimination." [R. 24, Plaintiff's Response at p. 16] Even assuming for the sake of argument that the logic and holdings of retaliation cases apply in this non-retaliation context, neither case shows that the proximity at issue here is sufficient. *Montell* did say that temporal proximity alone can be enough to show a causal connection between protected activity and an adverse employment action. *Montell v. Diversified Clinical*

*Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (applying the Title VII retaliation standard to Kentucky state law claims). But *Montell* noted that temporal proximity is not always enough:

> [w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). "How close is 'very close'? . . . [O]ur cases indicate that the line should be drawn shy of the ten-week mark." *Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) (FMLA retaliation context).

Here, the Plaintiff has not pointed to any case suggesting that a period longer than six weeks would suffice. *Montell* was a retaliation case involving evidence that the plaintiff's termination came a *single day* after her protected activity. *Id.* at 506. *Trujillo* was an ERISA and ADA associational discrimination case in which the time periods between the Plaintiffs' protected activity and the relevant adverse employment actions (investigation and termination) were less than three weeks as to one and approximately six weeks as to the other. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 (10th Cir. 2008). By contrast, the Plaintiff here was suspended over two and a half months (11 weeks and 3 days) after the news stories aired, and was fired almost three months (12 weeks and 2 days) afterwards. The Plaintiff also cites the "unprofessional and isolating treatment in the office" which she claims began "immediately after" the news stories aired. [*See* R. 24, Plaintiff's Response at p. 17] But in both *Montell* and *Trujillo*, the temporal proximity was in relation to termination – clearly an adverse employment action. Neither case involved or discussed temporal proximity in relation to being ostracized by

co-workers, and the Plaintiff does not cite any authority showing that this behavior amounted to an adverse employment action or is otherwise properly an appropriate yardstick by which to measure temporal proximity. Accordingly, the Court will not consider this temporal proximity. Thus, "some time elapse[d]" between the airing of the news stories and the subsequent adverse employment actions, requiring temporal proximity to be coupled with other evidence. And as explained below, there is no other evidence to combine it with.

Second, viewed in the light most favorable to the Plaintiff, Martin's remark does show animus, but there is nothing in it to permit the inference that this animus was somehow connected to the Plaintiff's association with her son. The Plaintiff argues that this remark shows "that [her] co-workers viewed her association with Cartwright as a threat to their health and safety." [R. 24, Plaintiff's Response at p. 17] But that is pure speculation without any support in the remark itself, which does not even mention health or safety – let alone HIV specifically – at all. *C.f. Voltz*, 617 F. App'x at 424–25 (holding that statements made by an employee who had authority over personnel decisions and ability to take tangible employment actions, that male plaintiff's "command presence . . . was an issue in a building 'full of estrogen . . . [and] as a male, he was not going to survive'" did not establish gender-based discriminatory animus); *Chattman*, 686 F.3d at 349, 353 (finding racial animus where comments made by a human resources director included the N-word, "racist language and the threat or suggestion of violence or death based on race."); *Rawlings*, 854 F.3d at 384, 375 (finding genuine dispute as to subordinates' "bias" against Plaintiff for taking FMLA leave where evidence included lower-level supervisor's alleged sarcastic remark, "So are you planning on being out any time soon again?"). Likewise, when examined in context, Robinson's testimony that some of the employees who complained stated that they "felt physically threatened or intimidated by [the

Plaintiff's] presence in the office," [R. 24, Plaintiff's Response at p. 17], clearly do not bear any connection to Cartwright's HIV-positive status. Rather, these statements relate to the allegations that the Plaintiff engaged in flashing, mooning, flipping people off, keying a car, and other aggressive behaviors. [*See* R. 24-8, Morrison Depo. at pp. 28-31,44-46] Thus, this evidence does not permit a reasonable inference that the source of their fear was the Plaintiff's association with Cartwright.

Third, the fact that the decisionmakers relied on the co-workers' statements does not lead to a reasonable inference that those co-workers harbored animus.

Fourth, the Plaintiff's argument that "the same co-workers alleging conduct by [the Plaintiff] had seen the News Stories about Plaintiff's son, and since that time had demonstrated behavior indicative of bias against [her]" is essentially a recycled version of the argument that the co-workers' alleged "shunning" demonstrated their discriminatory animus against the Plaintiff. This argument has already been discussed.

Fifth, as mentioned, the evidence that the allegations against the Plaintiff were not reported until the investigation does not permit a reasonable inference that the co-workers who made them harbored animus against the Plaintiff due to Cartwright's HIV-positive status. This could support, at most, an inference that the co-workers fabricated these allegations – though the Court notes that an equally possible inference is that nobody but Coyle ever complained about the Plaintiff because Dunn and the Plaintiff were friends and her co-workers thought complaints would go nowhere, as allegedly happened with the car-keying incident. But even if the co-workers fabricated the allegations, that would not lead to an inference that the specific reason they were doing so was because of discriminatory animus based on the Plaintiff's association with Cartwright.

Finally, the Plaintiff's arguments regarding the investigation and its supposed defects more properly belong in the pretext analysis (and are essentially repeated in her arguments regarding pretext). Accordingly, they are addressed below.

### b) Burden-Shifting Framework

#### i. Pretext

Even assuming for the sake of argument that the Plaintiff could show all the elements of a *prima facie* case of associational disability discrimination, her claim must still fail because she has failed to show a genuine issue of material fact regarding pretext.

The defendant has articulated a legitimate, non-discriminatory reason for the plaintiff's termination: that "[t]he investigation conducted by Robinson and Stidham resulted in a well-substantiated pattern of misconduct [the Plaintiff] had engaged in vis-à-vis her co-workers." [R. 23-1, Summary Judgment Memo at p. 12] Accordingly, the plaintiff must show that this reason was pretextual. A plaintiff can show pretext "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Rawlings*, 854 F.3d at 379 (citation omitted). The Sixth Circuit has "acknowledged the criticism that has been leveled at the practice of segmenting the pretext inquiry into those three categories" and rather simply views them as "a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hillard*, 692 F.3d 523, 530 (6th Cir. 2012).

#### "No Basis in Fact"

The Plaintiff first argues that the Defendant's reason had no basis in fact. [R. 24, Plaintiff's Response at p. 20] Proving that the employer's reasons had no basis in fact requires "evidence that the reasons given by the employer simply did not happen." *Alberty v. Columbus*

*Twp.*, 730 F. App'x 352, 361 (6th Cir. 2018) (citation omitted) (ADEA context). There can be no dispute that the Defendant did conduct an investigation which revealed multiple *allegations* of misconduct on the part of the Plaintiff. The Plaintiff merely disputes that she actually *engaged* in this misconduct. However, the Defendant argues that it does not matter whether or not she engaged in the misconduct, pursuant to the honest-belief rule.

Under the honest-belief rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Rawlings*, 854 F.3d at 380 (internal citations and quotation marks omitted). An employer is entitled to summary judgment when it "reasonably and honestly relies on particularized facts in making an employment decision . . . even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citation omitted). The "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). The employer must point to particularized facts upon which it reasonably relied, but it is not required that "the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807.

Relying on *Rawlings*, the Plaintiff argues that the honest belief rule does not apply because of her reliance on the cat's paw theory. [R. 24, Plaintiff's Response at p. 21] However, as already discussed, the cat's paw theory of liability must fail in this case because the Plaintiff has failed to demonstrate a genuine issue as to a material fact on the issue of discriminatory animus. Thus, the honest-belief rule applies, and the standards set out in *Rawlings* and *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 799 (6th Cir. 2013) for independent investigations

sufficient to overcome liability for the discriminatory animus of lower-level employees do not apply.

Here, the undisputed facts show that the Defendant reasonably relied on the particularized facts before it at the time the decisions to suspend and eventually to terminate the Plaintiff were made. The Plaintiff points to no evidence to the contrary. She was already on a final warning at work for having violated a fundamental policy of all healthcare workers – patient privacy. Further, the Defendant points to the "numerous reports" the Plaintiff's co-workers made of "opprobrious and intolerable workplace behaviors." [R. 25, Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Defendant's Reply") at p. 4] It is undisputed that the decisionmakers responsible for the Plaintiff's suspension and termination relied on these reports, in conjunction with the final warning, for her termination. [*See, e.g.*, Plaintiff's Response at p. 4.] Indeed, the termination notice stated that the Plaintiff's behaviors violated its Sexual and Workplace Harassment Policy. [R. 24-2, Employee Counseling and Corrective Action Form at p. 1] The Plaintiff does not offer any evidence to rebut the Defendant's evidence that none of the actual decision-makers knew about Cartwright's HIV-positive status. Nor does she offer any evidence that any of the employees who complained about the Plaintiff mentioned Cartwright, or HIV/AIDS, at any point during the investigation. The Defendant thus had no reason whatsoever to think that the complaints might be part of a coordinated scheme to get the Plaintiff fired for illegal, discriminatory reasons. In these circumstances, it was entirely reasonable for the Defendant to rely on the fact that the Plaintiff was on her "last chance" along with the fact that multiple employees repeatedly (during the interviews and in some cases again when asked for written statements) alleged that the Plaintiff was engaging in inappropriate, sexually harassing behavior – allegations which, incidentally,

risked exposing the Defendant to legal liability if left unaddressed. *See Chen*, 580 F.3d at 401 ("Absent a reason to doubt the validity of" reports of performance problems, the Defendant "was entitled to rely on this information in deciding to terminate [the Plaintiff's] employment and acted reasonably in doing so.").

The Plaintiff's arguments regarding the Defendant's investigation hinge on its argument that the cat's paw theory renders the honest-belief rule irrelevant, and thus must demonstrate that "an in-depth and truly independent investigation" was conducted. [R. 24, Plaintiff's Response at p. 22] Because that is not the case here, these arguments essentially amount to complaints that the Defendant did not "leave no stone unturned." But the Defendant was not required to do so. *See Smith*, 155 F.3d at 807. The Plaintiff points to no authority showing that the Defendant was required to "reques[t] meaningful details about previously unreported incidents" and does not explain how those details would change the outcome or render the co-workers' statements more reliable. [*See* R. 24, Plaintiff's Response at pp. 22-23] Presumably, if the co-workers cannot be believed that the Plaintiff's misconduct occurred at all, they also cannot be believed on the details of that misconduct. The Plaintiff does not cite to authority showing that the Defendant was required to speak to all employees, including "high-level" employees such as Dunn and the doctors who worked at the office, after receiving multiple allegations of sexual harassment from comparatively lower-level staffers. *See id.* Even assuming that if asked, those employees would have stated that they had never seen, experienced, or heard of such behavior on the part of the Plaintiff, she has pointed to no authority (or even a rationale) showing that the Defendant would be required both to credit those statements and to discard the ones alleging misconduct. Nor does the Plaintiff cite to authority demonstrating that the Defendant should have "reasonably tailored" its investigation "to an inquiry of favoritism by practice management" and removed the

questions about aggressive and inappropriate behavior, or that the Defendant should have changed "the scope or line of questioning" once the investigation shifted to the Plaintiff's behavior rather than Dunn's. [*Contra* R. 24, Plaintiff's Response at p. 18] The fact that the Plaintiff had already been given a final warning further underscores the unconvincing nature of her arguments that the investigation was insufficient. The Plaintiff herself signed an acknowledgment that her unauthorized access of her son's medical records could result in immediate termination. [R. 23-2, Portions of Plaintiff's Deposition and Deposition Exhibits at p. 27, Page ID#: 134] Rather than immediately terminate her, the Defendant chose to give the Plaintiff one more chance and issue a final warning instead. That warning explicitly stated that the Plaintiff was to "have absolutely no issues with her work performance. If there are any issues that arise with [the Plaintiff] then the disciplinary action will be termination." *Id.* at p. 26, PAGEID#: 133. When new issues arose in the form of new allegations of misconduct, it was simply the proverbial straw that broke the camel's back. In the absence of any reason to put the Defendant on notice not to believe the complaints of additional issues with the Plaintiff, the Court sees no reason why the Defendant should have had to do anything more with the investigation than it did.

Likewise, the Plaintiff's argument that the Defendant "ignored meaningful evidence contrary to reports of misconduct" (apparently referring to the Plaintiff's own statements along with Dunn's statement that she had not received any similar complaints and a physician's disbelief that such behavior could happen without his knowledge) fails to show that the Defendant did not make "a reasonably informed and considered decision" before suspending and terminating her. Obviously, the mere fact that the Defendant did not credit the Plaintiff's denials of misconduct does not show a deficient decision-making process. The Plaintiff references the

opinions of both Dunn and of Harrison.  But as the Defendant points out, Dunn was the original

subject of the investigation, and was also accused of favoritism toward the Plaintiff, making it

reasonable to proceed with the investigation without her and to discount her statements and

views. [R. 25, Defendant's Reply at p. 4]  As to Harrison, he gave deposition testimony to the

effect that he went to Robinson in the time period right before the Plaintiff's termination and told

Robinson that he had not observed any threatening behavior from the Plaintiff and that – based

on his own independent questioning of her co-workers – he questioned the idea that so many of

them had  complained (although he also stated that he thought he either "didn't know the whole

story," or that the evidence against the Plaintiff was exaggerated). [R. 24-4, Harrison Depo. at

pp. 10-19]  He also posted a hand-written statement in the office protesting the Plaintiff's

termination and expressing his views as to facts he believed undercut the investigation and the

allegations against the Plaintiff. [R. 24-12, Letter from Harrison to Office]  But all of this came

*after* the decision to terminate the Plaintiff. [*See, e.g.*, R. 24-4, Harrison Depo. at p. 11]  The

Defendant's decision-making process cannot be said to have "ignored" statements which were

not even made until after the decision was made. *See Smith*, 155 F.3d at 809 (stating that

employer could not buttress its honest belief with evidence that decision-maker did not have

before her when making the decision).  And the Plaintiff does not cite to any authority showing

that it was obligated to re-open its investigation or reverse the decision it had already made, just

because another employee questioned the decision or the basis for the decision.  In the same

vein, both Dunn's and Harrison's statements praising the Plaintiff's work performance are

irrelevant to the propriety of the investigation, because they were made after the onset of

litigation.

Similarly unconvincing is the Plaintiff's argument that the Defendant "opened the door to employee gossip" when asking the questions about aggressive and inappropriate behavior – especially since these questions were actually included in the original sample questions which Stidham sent to Robinson. [R. 24, Plaintiff's Response at pp. 22-23]  Indeed, the Plaintiff's arguments try to have it both ways: the investigation was both too constricted (because it did not include interviews with all employees), and too broad (because it asked employees general questions regarding whether they had experienced aggressive or inappropriate behavior).  And – lacking evidence of discriminatory animus to support a cat's paw theory – the Plaintiff has pointed to no authority showing that it was wrong for the Defendant to rely on the employees' statements of what they had heard of and personally witnessed regarding the Plaintiff's behavior.  *Contra Seeger*, 681 F.3d at 287 (indicating that employees' formal statements of what they witnessed was among evidence properly relied upon in a defendant's "thorough" investigation).

<u>"Did Not Actually Motivate"</u>

The Plaintiff next argues that the Defendant's proffered reason did not actually motivate the adverse employment action. [R. 24, Plaintiff's Response at p. 20]  This method of showing pretext requires that "the plaintiff admi[t] the factual basis underlying the employer's proffered explanation and further admi[t] that such conduct could motivate dismissal," while "indirectly attempting to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Alberty*, 730 F. App'x at 362 (quotation marks and citations omitted) (ADEA context).  As the Plaintiff does not admit the factual basis underlying the Defendant's proffered explanation, she cannot use this method of showing pretext.  Even if that were not so, the basis of this argument is the cat's paw theory, which has already been addressed.

Finally, the Plaintiff argues that "the temporal proximity between the disclosure of Cartwright's health condition and the adverse actions against [the Plaintiff], as in the context of Plaintiff's *prima facie* burden, is also an indicator that the allegations against [her] are pretextual. . . . The dispute of fact on which [the Plaintiff's] termination was based, in conjunction with evidence of the temporal proximity of [her] termination and the biased statements made by [her] co-workers, is sufficient as a matter of law" to support a reasonable finding of pretext. [R. 24, Plaintiff's Response at p. 21]  It appears that this is essentially a form of the argument that there is no basis in fact for the Defendant's proffered reason, because it references the truth of the basis for the Plaintiff's termination, and the temporal proximity argument goes to the theory that the allegations are false and were fabricated due to animus based on the Plaintiff's association with Cartwright.  However, as shown above, the honest-belief rule applies, rendering it irrelevant whether or not the allegations against the Plaintiff were true, and the Plaintiff has not argued that the honest-belief rule does not apply to this pretext argument.  And the Plaintiff's arguments regarding the temporal proximity of her termination, and Martin's supposedly biased statement, have already been addressed above.

### B.  State Law Claims: Kentucky Civil Rights Act and Wrongful Termination

The Plaintiff's state law claims fare no better.  Citing to *Burus v. Wellpoint Companies, Inc.*, No. 5:08-154-KKC, 2010 WL 1253089, at *12 (E.D. Ky. Mar. 25, 2010), *aff'd*, 434 F. App'x 475 (6th Cir. 2011), the Defendant argues that the Plaintiff's claim based on the KCRA must fail because the KCRA does not include an associational discrimination provision like that found in the ADA.  The Plaintiff's only counter is that "Kentucky Courts recognize that the

purpose of the KCRA is among other things, to provide for execution within the state of the policies embedded in . . . the Americans with Disabilities Act of 1990." [15] [R. 24, Plaintiff's Response at pp. 23-24 (internal quotation marks omitted).]  But that is not responsive to the logic of *Burus*, adopted by the Sixth Circuit, which reasoned that associational discrimination under the KCRA is not cognizable because state courts look to federal law for guidance in disability discrimination cases "only insofar as the ADA is 'similar' to" the state law. *Burus v. Wellpoint Companies, Inc.*, No. CIVA5:08-154-KKC, 2010 WL 1253089, at *12 (E.D. Ky. Mar. 25, 2010), *aff'd*, 434 F. App'x 475 (6th Cir. 2011) (citation omitted).

As the Plaintiff does not argue (and an examination of the statute does not reveal) that the relevant aspects of the KCRA have changed since *Burus* was decided, the Court finds the analysis in *Burus* persuasive, and applies it here.  The Court likewise finds convincing *Burus*'s analysis that since the court "ha[d] determined that the Plaintiff's claim that she was fired because of her . . . husband's disability . . . fail[s,] [a]ccordingly, the wrongful discharge claim which is based on the same assertions must also be dismissed." *Id.* at *13.  Accordingly, the Court will grant summary judgment as to both the Plaintiff's KCRA claim for associational discrimination as well as the Plaintiff's common-law wrongful termination claim.

### III.    CONCLUSION

For these reasons, the Court will grant summary judgment to the Defendant as to all claims in this action and deny the pending Motion in Limine as moot.  Accordingly, and the Court being otherwise sufficiently advised,

---

[15] The Plaintiff also cites to *Noel v. Elk Brand Mfg. Co.*, 53 S.W.3d 95 (Ky. Ct. App. 2000) without analysis. [R. 24, Plaintiff's Response at p. 24]  The Plaintiff does not explain, and the Court fails to see, how this case demonstrates that either of the state law claims should survive.

**IT IS HEREBY ORDERED** as follows:

1. The Defendant's **Motion for Summary Judgment** [**R. 23**] is **GRANTED**.

2. The Plaintiff's **Motion in Limine** [**R. 28**] is **DENIED AS MOOT**.

3. A separate Judgment will be entered consistent with this Order.

This the 31st day of March, 2019.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY